## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                                       :
NICOLE, L.[1],                                         :            3:23-CV-1036 (RMS)
    Plaintiff,                                         :
                                                       :
V.                                                     :
                                                       :
MARTIN O'MALLEY, COMMISSIONER                          :
OF THE SOCIAL SECURITY                                 :
ADMINISTRATION,[2]                                     :
    Defendant.                                         :
                                                       :            SEPTEMBER 11, 2024
------------------------------------------------------ x
```

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE OR, IN THE ALTERNATIVE, TO REMAND AND THE DEFENDANT'S MOTION TO AFFIRM

This is an administrative appeal following the denial of the plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").[3]

It is brought pursuant to 42 U.S.C. § 405(g).

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial(s). *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] When the plaintiff filed this action, she named then-Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, as the defendant. (*See* Doc. No. 1). On December 20, 2023, Martin O'Malley was appointed as Commissioner of the Social Security Administration. As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this matter.

[3] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, i.e., payment into Social Security through employment income for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), id. at 423(c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013); *see* 42 U.S.C. § 1382(a). "Determinations of disability under Title II and Title XVI of [the Act] are governed by parallel regulations that are, as relevant here, equivalent." *Spottswood v. Kijakazi*, No. 23-54-CV, 2024 WL 89635, at *1 (2d Cir. Jan. 9, 2024) (summary order) (citing *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019)).

The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner").  (*See* Doc. No. 17).  In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings.  (*Id.*).  The Commissioner, in turn, has moved for an order affirming his decision.  (*See* Doc No. 21).

As set forth herein, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **GRANTED IN PART** and **DENIED IN PART**, and the Commissioner's motion for an order affirming that decision is **DENIED**.

## I.   <u>PROCEDURAL HISTORY</u>

On February 10, 2021, the plaintiff filed an application for DIB benefits with an alleged onset date of January 8, 2021.  (*See* Doc. No. 12 (Certified Transcript of Administrative Proceedings, dated September 29, 2023 ("Tr.")) at 193–94).  The plaintiff's application was denied initially on October 13, 2021, and again upon reconsideration on January 12, 2022.  (Tr. 104, 111). On June 14, 2022, Administrative Law Judge John Aletta ("ALJ") held a hearing during which the plaintiff and a vocational expert testified.  (Tr. 38–82).  Eight days later, the ALJ issued an unfavorable decision, denying the plaintiff DIB benefits.  (Tr. 15–31).  On June 8, 2023, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the Commissioner's final decision.  (Tr. 1).

On August 3, 2023, the plaintiff filed the Complaint in this pending action.  (Doc. No. 1). On August 22, 2023, the plaintiff filed a Notice indicating that she consents to a United States Magistrate Judge's jurisdiction over this matter, including the entry of a final judgment.  (Doc. No. 10).  The following day, this matter was transferred to the undersigned.  (*See* Doc. No. 11).  On November 29, 2023, the plaintiff filed her Motion to Reverse the Decision of the Commissioner, along with a supporting memorandum (Doc. No. 17-1).  The Commissioner filed his Motion to Affirm, along with his own supporting memorandum on January 23, 2024.  (Doc. No. 21-1).

II.   <u>**FACTUAL BACKGROUND**</u>

The medical records demonstrate that the plaintiff suffers from the following relevant physical conditions: degenerative disc disease in her spine, degenerative joint disease in her right hip, a partial tear of her left rotator cuff, carpal tunnel syndrome in her left hand, neck pain, dysphasia (*i.e.*, difficulty swallowing), gastroesophageal reflux disease and other gastrointestinal issues.   The records also indicate that she has the following mental health conditions: major depressive disorder, posttraumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD") and generalized anxiety disorder.   The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' briefing.   (*See* Doc. No. 17-1 at 1–9; Doc. No. 21-1 at 2–4).   The Court cites only the portions of the record that are necessary to explain this decision.

A.   <u>**The Plaintiff's Hearing Testimony**</u>

On June 14, 2022, the plaintiff appeared telephonically for a hearing before the ALJ regarding this disability application.[4]   (*See* Tr. 38–82).   At the hearing, the plaintiff initially testified about her work history.   Around 2007, the plaintiff was the owner/operator of Lagoon's Restaurant, where she cooked, washed dishes, bussed tables, made schedules for her six employees, managed the front and back of the house, and worked with vendors.   (Tr. 45–47).   She spent 75% of the time walking and 25% of the time sitting at a desk, and she typically lifted 30 pounds or less.   (Tr. 47).   By 2015, the plaintiff worked for a steakhouse as a hostess where she stood or walked 80% of the time and only lifted about two pounds.   (Tr. 48).   From 2018 to 2020, the plaintiff owned her own business as a subcontractor, delivering medications to private

---

[4] The hearing was conducted via video conference, due to the extraordinary circumstance presented by COVID-19.

residences in New York and New Jersey on behalf of Stop and Shop.  (Tr. 49).  She drove her vehicle 80% of the time and rarely lifted more than one pound.  (Tr. 49–50).

The ALJ asked the plaintiff to testify about why she could not work.  The plaintiff began by discussing her physical pain.  She testified about osteoarthritis in her spine, which caused her debilitating pain, migraines, energy and appetite loss, and an inability to sleep (Tr. 50–51); osteoarthritis in her hips (Tr. 51); a history of rotator cuff pain, including a past surgery (Tr. 51–52); bone spurs (Tr. 51); carpal tunnel (Tr. 53); neck pain that radiated to her forearm (Tr. 62); dysphasia and acid reflux (Tr. 63); insomnia that would cause her to get only two hours of sleep at least four days a week (Tr. 64); and shortness of breath from chronic obstructive pulmonary disease ("COPD") and emphysema (Tr. 64–65).  The plaintiff testified that she had difficulty picking up a gallon of milk and pouring it into a cup, bending, and putting on her socks.  (Tr. 56).

The plaintiff also testified about her psychological symptoms.  Since the age of fifteen, she had been suffering from "extreme anxiety and panic disorder," which she struggled to control since her husband assaulted her in 2020.  (Tr. 52, 53).  She testified that her PTSD symptoms had been unmanageable—she would black out, feel "rage," and be "passive-aggressive." (Tr. 52–53).  The plaintiff also testified that she had found it difficult to socialize, because she had been over-emotional and inappropriately reacted to others.  (Tr. 57).  The plaintiff struggled to concentrate or complete tasks despite taking her ADHD medication.  (*Id.*).

The ALJ asked the plaintiff about her ability to complete tasks at home.  The plaintiff testified that she could clean her house, make herself TV dinners (but could not cook), maintain personal hygiene and bathe, do her own laundry, and grocery shop for approximately fifteen minutes at a time.  (Tr. 57–58).  The plaintiff testified that she was able to mow her grass with a tractor, although she could only do it for about ten to fifteen minutes at a time because it hurt her

rotator cuff and gave her migraines.  (Tr. 68).  For entertainment, the plaintiff enjoyed crafts and books but struggled to finish the projects.  (Tr. 59).  She testified she could socialize with a friend and her aunt regularly.  (Tr. 60).

### B.    The Vocational Expert's Testimony

Vocational expert Ruth Baruch also testified at the plaintiff's hearing.  (Tr. 73–81).  The ALJ first asked Baruch to categorize the plaintiff's work history.  Baruch stated that the plaintiff worked as a restaurant manager, a light and skilled job that she performed at a medium level; as a courier, a light and unskilled job that she performed at a light level; and as a hostess, a light and skilled job that she performed at a light level.  (Tr. 74–75).

The ALJ presented several hypotheticals and asked Baruch to opine about the possible substantial gainful activity with the following assumptions: the person would have the plaintiff's age, education, work experience, and capability of working at the light exertional level.  (Tr. 75).

First, the ALJ asked Baruch to opine on the jobs that would be available if the person (1) "could occasionally reach overhead with their non-dominant left upper extremity"; (2) could "frequently climb ramps and stairs"; (3) could "occasionally climb ladders, ropes or scaffolds"; (4) could frequently stoop, kneel, and crouch; (5) could "occasionally crawl"; (6) could not "work at unprotected heights"; (7) could "perform simple, routing tasks"; and (8) could "tolerate occasional brief interaction with the general public and c[ould] tolerate occasional interaction with coworkers."  (Tr. 75–76).  Baruch testified that this person could still perform work as a courier (but not hostess or restaurant manager) and could also work as a price marker, electrical assembler, and mail sorter.  (Tr. 77–78).

Next, the ALJ asked Baruch to take that same hypothetical individual but add a need for being off task fifteen percent of a 40-hour work-day.  (Tr. 79).  Baruch testified that there would not be any jobs in the national economy that would tolerate this off-task behavior, because ten

percent off task is the "breaking point." (Tr. 79, 80). The ALJ then changed the hypothetical slightly, asking whether a job could accommodate the same individual but with a need for taking two unscheduled days off per month. (*Id.*). Baruch testified that no such job existed. (*Id.*).

The plaintiff's attorney then asked Baruch to opine about whether the plaintiff's past jobs as a courier, hostess, and restaurant manager could be performed if the individual was limited to "less than frequent handling and fingering with both the dominant and the non-dominant hands." (Tr. 80). Baruch testified that a person could not perform those jobs with that limitation. (*Id.*).

### C.   <u>Objective Medical Evidence</u>

The relevant issues in this appeal involve the ALJ's findings about the plaintiff's mental health impairments.[5] In discussing the plaintiff's mental health, the ALJ cited to objective medical evidence from her therapist, Marie T. Sandoli, Ph.D. (Exs. 2F, 14F); her primary care provider, Intermed Associates (Exs. 3F at 33 & 61, 4F at 7, 11F at 5–7); the Worcester Surgical Center (Ex. 3F at 66); Ear Nose and Threat Associates of Worcester, Inc. (Ex. 6F at 25), and UMass Memorial Health Care (9F at 5, 24F at 6).

### 1.   Pre-Onset Date

The majority of the records cited by the ALJ predate the disability onset date. (*See* Tr. 313–328 (2F), 361 (3F at 33), 389 (3F at 61), 394 (3F at 66), 414 (4F at 7), 474 (6F at 25); 602–612 (14F at 1–11)). The ALJ cited these records to document the plaintiff's history of depression,

---

[5] In her memorandum, the plaintiff argues that one reason (out of several) why the ALJ's RFC determination constitutes reversible error is because he failed to incorporate limitations regarding the plaintiff's left non-dominant should, arm, and hand. (Doc. No. 17-1 at 13). The plaintiff does not cite to the record or provide any legal authority supporting her position. Because the Court remands on unrelated grounds *and* because the plaintiff failed to provide meaningful analysis of this issue, the Court will not summarize the objective medical evidence regarding her non-dominant side limitations.

anxiety, ADHD, and PTSD, as well as the incident in January 2020 when her now-ex-husband assaulted her.  (*See* Tr. 24).

### 2.    Post-Onset Date

The objective medical evidence contains only seven appointments that took place after the onset date: two with Intermed Associates and five with Dr. Sandoli.  (*See* Tr. 504 (9F at 5), 538–540 (11F at 5–7), 613–14 (14F at 12–13)).

On July 19, 2021, the plaintiff visited her primary care provider for a three-month follow-up visit.  (Tr. 504 (9F at 5)).  In relevant part, her provider gave the following summary:

> She reports of doing reasonably well at this time except for stress in the setting of divorce proceedings.  She is concerned about her safety as she feels as though she is being stalked by her husband since 06-30-2021.  She has installed several cameras around her house due to this and has been in constant communication with law enforcement.  She continues smoking on a daily basis due to stress. . . .  She is currently not seeing a therapist due to financial constraints.

(*Id.*)

The plaintiff returned to Intermed Associates for another follow-up appointment on October 14, 2021.  (Tr. 538–540 (11F at 5–7)).  During the physical exam portion of the appointment, the provider noted that the plaintiff had "[a]ppropriate dress and behavior" and her "[a]ttention, judgement and emotional stability [were] intact."  (Tr. 540).  The plaintiff reported "doing reasonably well at this time" and said "[her] stress level at this point is not that bad." (Tr. 538).  But she also complained of insomnia, was afraid of "being stalked," and lost weight due to these issues.  (*Id.*).  The plaintiff indicated she could not see her therapist "due to financial constraints."  (Tr. 538).

The plaintiff was able to visit her mental health therapist, Dr. Sandoli, by the following month.  (Tr. 613).  On November 9, 2021, Dr. Sandoli observed the plaintiff "was so talkative and all over office with photos, texts & copy of her summons" and that "she was extremely anxious

b/c she feels she's being 'watched' from her home. 'I'm so terrified.'" (*Id.*)  Dr. Sandoli also stated: "I do see Nicole as demonstrating PTSD; depression and anxiety.  I do not see her capable of working at this time.  She applied for disability—1ˢᵗ attempt was denied." (*Id.*).

On December 6, 2021, Dr. Sandoli treated the plaintiff again.  Dr. Sandoli noted the plaintiff "came in shaking and quite anxious / manic." (*Id.*).  The notes indicated that the plaintiff kept her GPS on while she slept, and her GPS "shows evidence of a 'car' and people 'guy' [sic] in woods." (*Id.*).  Other topics discussed during the session included that the plaintiff traveled to Florida with her church, she was stressed about divorce proceedings, and she was receiving medical treatment for her spine. (*Id.*).  Dr. Sandoli also noted, "She is so anxious w/ signs of PTSD." (*Id.*).

Two weeks later, on December 20, 2021, the plaintiff returned for a session with Dr. Sandoli.  They discussed the plaintiff's traumatic relationship with her mother and ex-husband. (*Id.*).  Dr. Sandoli noted (with an asterisk): "Shakes and cries often in session." (*Id.*).

One week later, on December 27, 2021, the plaintiff had another therapy session.  The plaintiff reported that she "cried through Christmas," and Dr. Sandoli noted she "stutters and shakes." (Tr. 614).  The plaintiff discussed family stressors and indicated she would "leave ministries." (*Id.*).

The last therapy session in the record is dated January 3, 2022. (*Id.*).  Dr. Sandoli indicated that the plaintiff had depression, anxiety, "too much in her head," and PTSD resulting from her ex-husband violently assaulting her. (*Id.*).

### D.    <u>Medical Opinions</u>

The medical opinions relevant to this case concern the consultative examiner Kathleen J. Murphy, Ph.D.; state agency psychological consultants John Warren, Ed.D., and Warren Leib,

Ph.D., who completed the mental health portions of the Disability Determination Examinations at the Initial and Reconsideration stages, respectively; and Dr. Sandoli.

### 1. Consultative Examiner

On July 31, 2021, Dr. Murphy evaluated the plaintiff for a consultative psychodiagnostics intake. (Tr. 494). Dr. Murphy conducted an interview, performed the Mini-Mental Status Examination ("MMSE") assessment, and reviewed records.[6] (*Id.*).

During the interview, the plaintiff was asked about her family, medical, education, employment, legal, alcohol/drugs, and psychiatric histories. (Tr. 495–496). Starting with her childhood and family history, the plaintiff stated her mother was emotionally abusive and that she had a traumatic childhood. (Tr. 495). The plaintiff dropped out of school after she was date-raped and became pregnant. (*Id.*). The plaintiff ultimately graduated from high school at the age of 21. (*Id.*). The plaintiff took care of her father for seven years before he died. (*Id.*). In 2018, the plaintiff married her husband but since filed for divorce after he violently assaulted her in January 2020. (*See id.*). At the time of the interview, the plaintiff enjoyed a good relationship with her mother but had a strained relationship with her brother and her three adult children. (*Id.*).

With respect to her medical history, the plaintiff described her chief complaint as osteoarthritis in her spine. (Tr. 494). The plaintiff saw a mental health therapist, Dr. Sandoli, as needed. (Tr. 496). With respect to her general mental health, she described her current mood as "happy and focused" and denied a history of psychiatric hospitalization; suicidal, psychotic or homicidal ideation; or current issues with panic attacks. (*Id.*). The plaintiff typically slept four to five hours each night. (Tr. 495). She described her surgical history and listed the following

---

[6] Dr. Murphy also performed the Weschler Adult Intelligence Scale – Fourth Edition ("WAIS-IV") assessment, but the results are not relevant to the issues in this appeal.

diagnoses: ADHD, osteoarthritis, degenerative disc disease, mild COPD, hematoma in her jugular gland, emphysema, high cholesterol, mutated breast cancer susceptibility gene (as an increased risk for colon cancer), ulcerative colitis, diverticulitis, and dyslexia.  (Tr. 495–496).  She did not use alcohol or street drugs and had a history of smoking.  (Tr. 496).

As for employment, the plaintiff last worked as a subcontractor for Stop and Shop, delivering medications for five years.  (Tr. 495).  She lost her job on January 8, 2021.  (*Id.*).  Before that, she worked for a year as a server in a restaurant and for ten years as a business owner.  (Tr. 495–496).  At the time of the interview, the plaintiff stated: "I'm the founder of a new public charity, 501 C approved.  I'm using this as therapy to process trauma from my husband.  It's become my passion.  I am opening up an advocacy office.  Paying it forward."  (Tr. 496).  The plaintiff also described a desire to open a ministry house, a free community store, and a community house.  (*Id.*).

After conducting the MMSE assessment, Dr. Murphy gave the plaintiff a score of 24 out of 30, "suggesting mild impairment in mental status."  (Tr. 497).  Dr. Murphy concluded the plaintiff's abstract reasoning skills were in the "low average range," her judgment was "below average," and her insight was "average."  (*Id.*).  According to Dr. Murphy, the plaintiff was talkative and responsive to questions, could articulate her words and express her thoughts clearly, and was alert and oriented to place and time.  (Tr. 497–498).  The plaintiff maintained good eye contact, had an animated affect, was "very polite and cooperative" and "not restless or fidgety," and "seemed motivated to answer questions."  (Tr. 497).  Dr. Murphy did, however, describe the plaintiff's mood as "upset" but offered no explanation.  (*Id.*).

Dr. Murphy evaluated the plaintiff's current level of functioning on four axes.  For Understanding and Memory, Dr. Murphy concluded the plaintiff had "the ability to understand

and remember at least three-step directions." (Tr. 498).  For Social Functioning, Dr. Murphy concluded, "Although she interacts with family and friends, trauma-related anxiety and physical pain may limit the frequency and quality of these interactions and communications." (*Id.*).  For Concentration and Task Completion, Dr. Murphy concluded the plaintiff could concentrate and focus on the one-on-one intake interview, albeit with the assistance of Adderall. (*Id.*).  Finally, for Adaptation to Work or Work-Life Situations, Dr. Murphy concluded that the plaintiff's "ability to tolerate stress, make decisions, maintain attendance, be reliable and dependent, and interact with supervisors in the workplace may be reduced because of physical pain and trauma-related anxiety." (*Id.*).

### 2.    State Agency Psychological Consultants

At the initial Disability Determination Examination on August 6, 2021, state agency psychological consultant Dr. Warren evaluated the plaintiff's mental health records. (*See* Tr. 84–91).  When Dr. Warren reviewed the evidence, Dr. Sandoli's reports were current through July 2021, the consultative examiner's report from July 2021 had been submitted, and one primary care visit regarding mental health from May 2020 was in the record. (Tr. 85–86).  He summarized the plaintiff's psychiatric records as follows:

> Claimant primarily with somatic/mood issues, also some mood/anxiety symptoms and thought to had ADHD, under medication management, with benefit.  Recent mental CE shows claimant rather dysphoric, however, actual performance on mental status examination unremarkable.  Overall, functional limitations attributable to mental impairment are not severe.

(Tr. 87–88).  Dr. Warren found the plaintiff's mental health limitations were "mild." (Tr. 87).  The report does not include a residual functional capacity ("RFC") assessment. (*See* Tr. 90).

On reconsideration, the state agency psychological consultant Dr. Leib assessed a medical record that had been updated through January 2022. (Tr. 97).  Dr. Leib summarized the mental health records, noting that the plaintiff's treating therapist's records "[c]onsist[] of process notes

with no clear and complete MSEs." (*Id.*).  He also summarized the consultative examiner's report as follows:

> [D]escribes ongoing stressors and conflicts but was stable and functioning adequately.  Actively engaged in charity work. . . .  Polite, cooperative and well related during the exam.  Good [eye contact].  TP and TC normal with no evidence of psychosis.  Actively engaged with family and friends.  GAF 59 suggesting mild to mod severity.[7]

(*Id.*).  Dr. Leib concluded: "Anxious, depressed with PTSD and characterological problems (latter not formally dxed).  Dealing with multiple stressors, continues OP therapy, actively engaged socially and with charity work.  Retains ability to work in a low demand setting as reflected in MRFC."[8]  (*Id.*).  Dr. Leib found that the plaintiff's mental impairments were "non severe."  (Tr. 96).  With respect to the plaintiff's RFC, Dr. Leib determined her mental health limitations ranged from "not significantly limited" to "moderately limited" in the categories of "sustained concentration and persistence" and "social interaction."  (Tr. 100).  Dr. Leib specified:

> Low CCP tolera[nce] due to ongoing stressors and emotional issues but cognition intact and retains ability to complete various work related tasks in a low demand environment.
>
> * * *
>
> Anxious, depressed, emotionally labile and subject to outbursts and episode of dyscontrol when upset but can relate adequately for the purpose of completing tasks in a low demand setting.

(*Id.*).

---

[7] Dr. Leib does not define "TP" and "TC." "GAF" stands for the Global Assessment of Functioning Scale, which the Social Security Administration defines as "a rating reporting a medical source's judgment of an individual's overall ability to function in daily life."  *Supplemental ALJ Training*, Social Security Administration (Aug. 30, 2024) at 32, https://www.ssa.gov/foia/resources/proactivedisclosure/2020/2017_Supplemental%20ALJ%20Training%20Notebook.pdf.  For claims filed after March 27, 2017, a GAF score is considered "other medical evidence."  *See id.* at 35; 20 C.F.R. § 404.1513(a)(3).

[8] "MRFC" is defined as in "Mental Residual Functional Capacity."  (*See* Tr. 90).

### 3.    Treating Provider

The plaintiff submitted two medical source opinions from Dr. Sandoli.  The first medical source statement was completed in January 2022 (Tr. 620–632), and the second was completed just two months later in March 2022 (Tr. 638–642).

The January 2022 medical source statement indicated that the plaintiff suffered from PTSD, anxiety and panic attacks, and depression.  (Tr. 620).  In evaluating the plaintiff's abilities on a range from "None" to "Unlimited," Dr. Sandoli generally scored the plaintiff between "None" and "Good," giving the plaintiff a few "Unknown" scores.  (Tr. 621).  Dr. Sandoli gave the plaintiff a score of "None" regarding her ability to "follow work rules" or "relate to coworkers" and gave her a score of "Poor" for her ability to "deal with the public." (*Id.*).  She gave the plaintiff a score of "Fair" or "Good" for her ability to "use judgment," "interact with supervisors," "deal with work stresses," "maintain attention/concentration," perform "simple job instructions," "maintain personal appearance," "behave in an emotionally stable manner," "relate predictable [sic] in social situations," and "demonstrate reliability." (*Id.*).  Dr. Sandoli indicated that the plaintiff was "too anxious and terrified" from past trauma to sustain work activity but that her ability to complete tasks, chores, and leisure activities was "less stuck since [she] began on Prozac."  (Tr. 622).

The March 2022 medical source statement was structured differently but similarly required Dr. Sandoli to opine on the plaintiff's ability to function in a work setting.  Dr. Sandoli was prompted to opine on 25 topics concerning the plaintiff's "mental abilities and aptitudes needed to do unskilled work" on a range of "No useful ability to function," "Unable to meet competitive standards," "Seriously limited," "Limited but satisfactory," and "Unlimited or Very Good."  (Tr. 639–641).  Out of the 25 topics, Dr. Sandoli scored the plaintiff with "No useful ability to function" in seventeen topics, "Unable to meet competitive standards" in four topics, and "Seriously limited"

in four topics.  (*Id.*).  Dr. Sandoli explained, "Nicole's level of stress, paranoia, and past abuse does not allow capability to work at this time," noting that therapy and medication was helping. (Tr. 640).  Dr. Sandoli indicated that the plaintiff would need to be "off task" more than 30% of a workday and that she would need to be absent or unable to complete a full workday five days or more per month.  (Tr. 641).

## III.    THE ALJ'S DECISION

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. § 404.1520(a).[9]

At Step One, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 8, 2021.  (Tr. 18).

At Step Two, the ALJ determined that the plaintiff had the following severe impairments: "degenerative disc disease of the cervical spine, degenerative disc disease of the thoracic spine, degenerative joint disease of the right hip, partial thickness tear of the left supraspinatus tendon

---

[9]  An ALJ determines a claimant's disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, an ALJ must determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment.  If none exists, then the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at Step Five that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

with tendinopathy, major depressive disorder, posttraumatic stress disorder, attention deficit hyperactivity disorder, [and] generalized anxiety disorder." (*Id.*). The ALJ further found that, while the plaintiff "presented with status post partial thyroidectomy, injured larynx with dysphagia, and left carpal tunnel syndrome . . . [those] medically determinable impairments d[id] not cause more than a minimal limitation in the [plaintiff]'s ability to perform basic work activities and are therefore nonsevere." (*Id.*). As to her partial thyroidectomy and injured larynx, the ALJ concluded that the record "show[ed] that the claimant engaged in brief treatment for trouble swallowing and voice hoarseness and that her symptoms improved." (*Id.*).

At Step Three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (the "Listings"). (Tr. 19–22). *See generally* 20 C.F.R. Part 404, SubPt P, App'x 1. First, the ALJ evaluated the Listings regarding musculoskeletal disorders. *See* 20 C.F.R. Part 404, SubPt P, App'x 1, § 1.00, *et seq*. The ALJ specifically considered the plaintiff's skeletal spine disorder, lumbar spine stenosis, and major joint abnormality, and determined that those impairments did not meet Listings 1.15, 1.16, or 1.18, respectively. (Tr. 19–20).

Second, the ALJ evaluated whether the plaintiff's mental impairments met the criteria of Listings 12.04, 12.06, 12.11, and 12.15. *See* 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00, *et seq*. Specifically, the ALJ considered whether the "paragraph B" and/or "paragraph C" criteria were satisfied, and found that the plaintiff's mental impairments did not satisfy the "paragraph B" criteria because they did not cause either at least two "marked" limitations, or one "extreme" limitation, and that, similarly, the evidence in the record failed to establish the presence of "paragraph C" criteria. (Tr. 20–22).

15

Next, the ALJ formulated the plaintiff's RFC.  A plaintiff's RFC is the most that a claimant can do despite their impairments and is determined by assessing all of the relevant evidence.  20 C.F.R. § 404.1545(a)(1).  The ALJ determined that the plaintiff had the RFC to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) with the following additional limitations: She can occasionally reach overhead with her left upper extremity; can frequently climb ramps and stairs; can occasionally climb ladders, ropes, or scaffolds; can frequently stoop, kneel, and crouch; and can occasionally crawl. She cannot work at unprotected heights. She can perform simple, routine tasks; can tolerate occasional, brief interaction with the general public; and can tolerate occasional interaction with co-workers.

(Tr. 22).

At Step Four, the ALJ found that the plaintiff was capable of performing her past relevant work as Courier (DOT 230.663-010), which did not require the performance of work-related activities precluded by her RFC.  (Tr. 28–29).

Notwithstanding the foregoing, the ALJ proceeded to Step Five of the sequential analysis. The ALJ determined, based upon the testimony of the vocational expert that "[c]onsidering the [plaintiff]'s age, education, work experience, and [RFC]," there were other "jobs that exist[ed] in significant numbers in the national economy that the [plaintiff] also c[ould] perform."  (Tr. 29). Specifically, the ALJ concluded that the plaintiff was able to perform the requirements of the following representative occupations: (1) Price Marker (DOT 209.587-034), an unskilled position requiring light exertion, of which 137,000 jobs exist in the national economy; (2) Electrical Assembler (DOT 729.687-010), an unskilled position requiring light exertion, of which 8,130 jobs exist in the national economy; and (3) Mail Sorter (DOT 209.687-026), an unskilled position requiring light exertion, of which 11,000 jobs exist in the national economy.  (Tr. 30).

Given these findings, the ALJ determined that the plaintiff was not disabled.  (*Id.*).

IV.   **STANDARD OF REVIEW**

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)).  The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in original) (citations omitted); *see also Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (when reviewing a denial of DAC, a district court may not make a *de novo* disability determination).  "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

"Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*. "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V.   <u>DISCUSSION</u>

The plaintiff raises three main arguments in this appeal.  First, the plaintiff argues the ALJ erred in his assessment of each medical opinion when he (a) found the state agency psychological consultants' medical opinions were consistent and did not explain why he arrived at his conclusion, (b) found Dr. Sandoli's medical source statements were not persuasive, and (c) failed to explain why Dr. Murphy's medical opinion was partially persuasive. (Doc. No. 17-1 at 9–13).  Second, the plaintiff contends that the ALJ's RFC determination failed to accurately incorporate the plaintiff's mental health limitations, as well as her physical restrictions in her left shoulder, arm and hand. (*Id.* at 13).  Third, the plaintiff posits the ALJ erred at Steps Four and Five, because his RFC determination was not supported by substantial evidence and the hypotheticals he posed to the vocational expert (on whom he relied) did not accurately reflect the plaintiff's limitations. (*Id.* at 13–14).

The Commissioner challenges each of the plaintiff's arguments, albeit in a slightly different order.  The Commissioner begins by addressing the plaintiff's first and second arguments, maintaining that the ALJ's mental RFC determination was supported by substantial evidence. (*See* Doc. No. 21-1 at 5).  Specifically, the Commissioner argues that the ALJ's RFC determination

18

need not match perfectly with the medical opinions, the ALJ's assessment was supported by treatment notes, the plaintiff's own testimony supported the ALJ's findings, the ALJ properly exercised his discretion to resolve evidentiary conflicts between the medical opinions, and the ALJ properly explained his evaluation of the medical opinions.  (*See id.* at 5–17).  Second, the Commissioner challenges another aspect of the plaintiff's second argument—that the ALJ failed to incorporate a physical limitation in the non-dominant left shoulder, arm, and hand—by contending that the evidence did not support the plaintiff's proffered restriction.  (*See id.* at 18–19).  Third, the Commissioner maintains that the plaintiff's claim that she could not perform her past jobs or other jobs in the national economy "is merely a rehashing of her prior argument," and the ALJ properly relied on the vocational expert's testimony in determining the RFC. (*See id.* at 19–20).  (*Id.*).

For the reasons below, the Court finds that the case should be remanded on the ground that the ALJ did not adequately explain his decision to discredit Dr. Sandoli's medical source statements.  Because the case is remanded on this ground, the Court does not address whether the ALJ's RFC was improperly formulated.  The Court also does not address whether the plaintiff could perform her past work or, alternatively, other jobs in the national economy.  On remand, the ALJ is instructed to: (1) order all treating providers, including Dr. Sandoli, to supplement the record; (2) re-evaluate the medical opinions consistent with this decision; (3) obtain a new consultative examination that is based on an up-to-date record and incorporates Dr. Sandoli's records after the onset date; and (4) determine the RFC and re-evaluate Steps Four and Five in light of this Court's ruling, the revised RFC and the new evidence presented on remand.

A.    **Medical Opinion Evidence**

A "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions," including, in relevant part, a plaintiff's "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting."[10]  20 C.F.R. § 404.1513(a)(2)(i).

Section 404.1520c of Title 20 of the Code of Federal Regulations sets forth the parameters an ALJ must follow when evaluating the persuasiveness of a medical opinion or prior administrative medical finding.  The Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a).  Instead, the ALJ evaluates the medical opinions by applying the five factors listed in 20 C.F.R. §§ 404.1520c(c)(1)–(c)(5).  These factors are: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factors.

Of these factors, "supportability" and "consistency" are the most important, and an ALJ must explicitly articulate how he considered them.  *See* 20 C.F.R. § 404.1520c(b)(2).  When considering "supportability," an ALJ is expected to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)."  20 C.F.R. § 404.1520c(c)(1).  The "consistency" factor relates to an opinion's consistency with other evidence in the record.  "The more consistent a medical opinion(s) or prior

---

[10] While the record contains consultants' and providers' medical opinions about the plaintiff's physical and mental diagnoses, the plaintiff only challenges those related to her mental health.

administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). An ALJ may explain how he considered the other three factors, but generally he is not required to do so. *See* 20 C.F.R. § 404.1520c(b)(2).

### 1.   The ALJ's Determination That The State Agency Consultants' Medical Opinions Were Persuasive Is Not Reversible Error.

With respect to the state agency consultants, the plaintiff lodges two main arguments. First, the plaintiff contends that the ALJ improperly found Dr. Warren's and Dr. Leib's opinions "persuasive" even though they conflicted. The apparent conflict, as the plaintiff sees it, was that Dr. Warren's assessment that the plaintiff's mental impairment was "non-severe" was inconsistent with Dr. Leib's observation that she was "anxious, depressed, had PTSD and characterological problems, which limited her to work in a low demand setting." (Doc. No. 17-1 at 9). Second, the plaintiff argues the ALJ failed to explain why he found both consultants persuasive despite the conflict. (*Id.* at 10).

The Commissioner reads the ALJ's assessment of Drs. Warren and Leib differently. While conceding that Dr. Warren's medical opinion differs from Dr. Leib's opinion, the defendant emphasizes that the ALJ "found the slightly-more restrictive one of Dr. Leib to be particularly more persuasive." (Doc. No. 21-1 at 11). The defendant also argues that the ALJ's conclusions about the plaintiff's limitations mirrored Dr. Leib's assessment that she had "mild to moderate limitations." (*Id.*). Lastly, the defendant posits that Dr. Warren's opinion was even less restrictive than Dr. Leib's opinion. (*Id.*).

The Court concludes that the state agency psychological consultants' medical opinions do not conflict. As the ALJ noted (Tr. 26), Dr. Warren determined that the plaintiff's mental health-related Medically Determinable Impairments were "non severe," (Tr. 87), a finding relevant at

Step Two.  Though Dr. Leib observed that the plaintiff was "[a]nxious, depressed with PTSD and characterological problems," "[d]ealing with multiple stressors," and  undergoing outpatient therapy, (Tr. 97), *within the same sentences,* Dr. Leib also noted that the plaintiff was "actively engaged socially and with charity work" and that she "[r]etains ability for work in a low demand setting as reflected in MRFC."  (*Id.*).  Dr. Leib agreed with Dr. Warren and concluded that the plaintiff's limitations were "non severe."  (*Id.*).  The seeming contradiction is likely due to the fact the ALJ did not explicitly mention Dr. Leib's Step Two assessment in his decision; instead, the ALJ focused on what appears to be Dr. Leib's Step Four RFC assessment: that the plaintiff had "mild to moderate limitations in the areas of mental functioning."  (Tr. 26).  In other words, the fact that the ALJ did not explain *both* consultants' findings at both Step Two and Step Four gave an appearance that the two consultants' opinions conflicted, even though they did not.[11]

The Court acknowledges (as does the Commissioner) that Dr. Warren and Leib arrived at slightly different conclusions when it came to the Step Three "paragraph B" Criteria Listings assessment.  Namely, Dr. Warren found the plaintiff had "mild" limitations in all four "paragraph B" Criteria Listing abilities: (1) "Understand, remember or apply information;" (2) "Interact with others;" (3) "Concentrate, persist, or maintain pace;" and (4) "Adapt or manage oneself."  (Tr. 87).  Dr. Leib, on the other hand, concluded that the limitations in the first and fourth categories were "mild" but that the limitations for the second and third were "moderate."[12]  (Tr. 96–97).  For a

---

[11] The Court presumes the ALJ's reference to "the areas of mental functioning" refers to page 100 of the record in which Dr. Leib evaluated the plaintiff's Mental Residual Functional Capacity, giving the plaintiff ratings from "Not Significantly Limited" to "Moderately Limited" for various topics related to two limitations: (1) Sustained Concentration and Persistence and (2) Social Interaction.  Dr. Warren did not complete an equivalent Mental Residual Functional Capacity assessment.  (*See* Tr. 90).

[12] The slightly different results may be attributable to the fact that Dr. Leib had the benefit of a more fulsome record than Dr. Warren.  *See* 20 C.F.R. § 404.1520c(c)(5) ("When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after

person's symptoms to meet or medically equal a 12.00 Mental Disorder Listing, the person *must* have an "extreme" limitation in one of the four categories *or* a "marked" limitation in two out of four categories.  *See* 20 C.F.R. Pt. 404, SubPt P, App'x. 1 § 12.00(A)(2)(b) ("Paragraph B"). Neither Dr. Warren nor Dr. Leib found the plaintiff had an "extreme" or "marked" limitation in any category.

The plaintiff's second argument—that the ALJ failed to properly explain why both Drs. Warren and Leib were "persuasive"—is similarly unavailing.  (Doc. No. 17-1 at 9–10).  In support, the plaintiff quotes *Simon v. Commissioner of Social Security*, No. 20-CV-127(KAM), 2020 WL 6488427, at *6 (E.D.N.Y. Nov. 4, 2020) for the proposition that a court must remand a case when the ALJ "has not thoroughly explained [his finding] in a manner that allows the court to be comfortable that it was supported by substantial evidence."  The court in *Simon* addressed an entirely different situation.  There, the ALJ assigned the consultative medical examiner's opinion "little weight," but that particular medical opinion was the *only* one in the record concerning the plaintiff's bodily impairments.  *See id.* at *5–6.  By disregarding the only medical opinion evidence, it was "not clear how the ALJ reached the conclusion that the plaintiff could perform 'medium work'" and so the court remanded the case for a thorough explanation to clarify the ALJ's rationale.  *Id.* at *6.

Here, the ALJ found Dr. Warren's opinion that the plaintiff's mental health impairments were "non severe" to be "persuasive" but concluded that her major depressive disorder, PTSD, ADHD, and generalized anxiety disorder constituted "severe impairments."  (Tr. 18).  To the extent that the ALJ should have found Dr. Warren "somewhat persuasive" (or less persuasive), this error

the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.").

was harmless because the ALJ gave the plaintiff a *more favorable* determination.  Despite Dr. Warren's opinion that the plaintiffs' mental health impairments were non severe, the ALJ concluded that they were severe.  "Where application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency consideration." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (quoting *Johnson*, 817 F.2d at 986) (alteration in original); *c.f. Tyler W. v. Comm'r of Soc. Sec.*, No. 3:22-CV-01345 (CFH), 2024 WL 1075209, at *6 (N.D.N.Y. Mar. 12, 2024) (remanding, in relevant part, on the ground that the ALJ failed to evaluate a medical opinion that "may be 'significantly more favorable' to plaintiff, given that her evaluation of plaintiff's mental functioning provides more restrictive limitations regarding his ability to concentrate, persist, or maintain pace").

> ### 2.   The ALJ Failed To Adequately Explain Why The Medical Source Statements From Dr. Marie Sandoli Were Not Persuasive.

The ALJ evaluated two medical source statements from the plaintiff's treating therapist, Dr. Sandoli: one from January 3, 2022 and the second from March 11, 2022.  (Tr. 620–632 & 638–642).  The ALJ found that Dr. Sandoli's medical source statements were not persuasive for two main reasons.  First, the ALJ concluded that the latter report "suggests much greater limitations in functioning than were previously opined" even though "[t]he record does not suggest that there was any significant change in the claimant's impairment during that time."  (Tr. 27).  Second, according to the ALJ, both medical source statements indicate that the plaintiff had more significant limitations than were documented in the record.  (*Id.*).

The plaintiff disputes the ALJ's two reasons for concluding Dr. Sandoli's medical opinions were not persuasive.  In addition, she argues that the ALJ failed to adequately explain how he considered the "supportability" and "consistency" of these opinions.  (Doc. No. 17-1 at 11); 20 C.F.R. § 404.1520c(b)(2).

The defendant argues that the objective evidence does not support Dr. Sandoli's medical source statements, which were only completed two months apart but were drastically different. (*Id.* at 16).  The defendant also contends that the plaintiff failed to show which medical records supported Dr. Sandoli's assessment.  (*Id.* at 17).

Beginning with "supportability," an ALJ is expected to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)."  20 C.F.R. § 404.1520c(c)(1).  Here, the ALJ failed to discuss Dr. Sandoli's explanations supporting her opinions, and he failed to compare Dr. Sandoli's medical source statements to her own objective medical evidence.  Instead, the ALJ merely compared Dr. Sandoli's two medical source statements against each other even though neither constitute objective medical evidence.  (*See* Tr. 27–28).  Dr. Sandoli's session notes from November 2021 through January 2022—her only treatment notes post-onset date—establish that the plaintiff was suffering from extreme anxiety, depression, and PTSD.  (*See* Tr. 613–614).  The records also establish that the plaintiff was paranoid about her ex-husband stalking her and that she was exhibiting manic symptoms.  (*Id.* (noting GPS "stays with her while she sleeps," observing the plaintiff "was so talkative and all over office with photos, texts & copy of her summons," and stating the plaintiff "came in shaking and quote anxious / manic")).  On November 9, 2021, Dr. Sandoli wrote that she believed the plaintiff's symptoms made her incapable of working at that time.  (Tr. 613).  While the record does not contain treatment notes after January 3, 2022, the five relevant therapy sessions in the record support Dr. Sandoli's medical source statements.

The Court is not persuaded by the defendant's description of Dr. Sandoli's treatment notes. As an initial matter, the majority of the treatment notes cited by the defendant predate the disability

onset date.[13]  (*See* Doc. No. 21-1 at 16–17 (Tr. 313–328, 388, 602–612 (pre-onset); 613–14 (post-onset)).  For the notes within the relevant time period, the defendant mischaracterizes them as showing that the plaintiff focused on her divorce and did not exhibit worsening symptoms. (*See id.* at 16–17).  According to the defendant, the relevant notes do not discuss the plaintiff's functioning at all.  The Court disagrees with this description of the evidence.  While it is true the divorce proceedings constituted one of the main discussion topics during each session, these topics bear little relevance to the issue of the plaintiff's capacity for work.  Indeed, Dr. Sandoli noted the plaintiff's symptoms—such as shaking, stuttering, mania, signs of PTSD—and on at least one occasion expressed her concern about the plaintiff's ability to function at work.  (Tr. 613–614).

In any event, the defendant's citation to objective medical evidence which the ALJ did not cite constitutes a *post hoc* rationalization that is impermissible on appeal.  *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A reviewing court 'may not accept appellate counsel's *post hoc* rationalizations for agency action.'"); *Lucius R. v. O'Malley*, No. 3:22-cv-01312-MPS, 2024 WL 1200181, at *13 (D. Conn. Jan. 22, 2024) (stating the Commissioner's argument "appears nowhere in the ALJ's decision, and it is well established that a reviewing court 'may not accept appellate counsel's post hoc rationalizations' for agency action") (quoting *Snell*, 177 F.3d at 134).

In light of this evidence, the Court concludes the ALJ's failure to explain "supportability" is a procedural error that is not harmless.  *See Shaw v. Chater*, 221 F.3d 126 (2d Cir. 2000) ("A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."); *Loucks v. Kijakazi*, No. 21-1749,  2022 WL 2189293, at *2 (2d Cir. June 17, 2022)

---

[13] The defendant recognizes that many of Dr. Sandoli's treatment notes "predate the relevant period." (Doc. No. 21-1 at 17).

(summary order) (ruling that the failure to adequately explain "supportability" and "credibility" factors constitutes procedural error but noting the court "could affirm if a searching review of the record assures [the court] that the substance of the [regulation] was not traversed").  *But see Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *8 (D. Conn. June 21, 2022) (remanding, in relevant part, on the grounds the ALJ issued "conclusory statements regarding the supportability and consistency" of the medical opinions and "declin[ing] to "engage in substantial evidence review to determine if the legal errors were harmless").

As for "consistency," this factor relates to a medical opinion's consistency with evidence from other medical sources.  "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2); *see Spottswood*, 2024 WL 89635, at *1 (defining "consistency" as "how consistent an opinion is with other evidence in the record").  Here, the ALJ compared Dr. Sandoli's two medical source statements with one page of objective medical evidence, the plaintiff's testimony about her daily tasks, and other medical opinions and concluded that Dr. Sandoli's opinions were inconsistent with the evidence. In doing so, the ALJ committed procedural error in several respects.

First, the ALJ found that the plaintiff "has been able to engage on medical appointments and presents as alert, oriented, attentive, cooperative, has intact memory, and clear speech."  (Tr. 27 (citing Tr. 685 (24F at 6))).  The Second Circuit explained in a summary order, *Loucks v. Kijakazi*, that mental status examinations—the term described by the ALJ—are not reliable standing alone, because they "analyze the patient's mental state only at the time of the examination and do not consider symptoms the patient may experience outside of that brief period of time."

*Loucks*,  2022 WL 2189293, at *2; *see Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019) ("[A]

one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health.").

Furthermore, the ALJ's finding is based on a single page of objective medical evidence that is

labeled in the transcript as UMass Memorial Health Center "progress notes" from April 20, 2022

to May 19, 2022, but, as far as the Court can tell, is otherwise unintelligible.  In contrast, other

objective evidence in the record indicates that the plaintiff's suffered from more significant mental

health symptoms than the ALJ described.  During the relevant period, the plaintiff twice visited

her primary care provider, complaining about stress, insomnia, lack of safety because her ex-

husband was stalking her, and weight loss from stress.[14]  (Tr. 504, 538–540).  While the primary

care notes are not as detailed as Dr. Sandoli's medical source statements, they are consistent with

Dr. Sandoli's explanations supporting her opinions.

   Second, the ALJ found that Dr. Sandoli's medical source statements conflicted with the

plaintiff's own testimony "that she has been able to care for personal needs, do some grocery

shopping, cleaning, and socializing." (*Id.*).  While it is true that an ALJ may consider the plaintiff's

nonmedical testimony, 20 C.F.R. §§ 404.1513(a)(4), 404.1520c(c)(2), it is well-established that a

plaintiff's ability to accomplish daily living tasks outside of work do not foreclose a disability

finding.  *See Loucks*, 2022 WL 2189293, at *3 ("[A]lthough the ALJ noted that Loucks reported

engaging in some limited and sporadic part-time work and that she engaged in some daily living

activities such as reading and playing games on her phone, these activities did not show that

Loucks could hold down a steady job for an extended period of time."); *Colgan v. Kijakazi*, 22

F.4th 353, 363 (2d Cir. 2022) ("There is some evidence that Colgan, a single mother, could to

---

[14] The mental status examination portion of the visit on October 14, 2021, indicates that the plaintiff maintained "[a]ppropriate dress and behavior" and her "[a]ttention, judgement and emotional stability [were] intact."  (Tr. 540).

some extent care for her two young children and engage in activities necessary to her own welfare. But we cannot say that these make a treating physician's findings flawed and foreclose an applicant's entitlement to disability benefits."); *Balsamo v. Chater*, 142 F.3d 75, 81–82 (2d Cir. 1998) (acknowledging an individual's ability to watch television, read, drive, take public transportation, garden, attend church, occasionally visit friends, and go shopping is not indicative that a person can perform sedentary work); *see also Pamela P. v. Saul*, 3:19-CV-575 (DJS), 2020 WL 2561160, at *6 (N.D.N.Y. May 20, 2020) ("The daily activities identified by the ALJ included Plaintiff's ability to dress, bathe, and groom herself, prepare meals, grocery shop, provide childcare, and do laundry.  There is no apparent connection between these physical activities and Plaintiff's mental functional abilities.") (internal citation omitted).  Dr. Sandoli focused her medical source statements on the plaintiff's ability to function in a workplace, not her ability to perform daily life tasks, and the one instance in which Dr. Sandoli remarked on the plaintiff's ability to perform life tasks was consistent with the plaintiff's testimony.  (*Compare* Tr. 640 (Dr. Sandoli: "She barely leaves her home except for medical and psychological appts. and to get groceries."), *with* Tr. 58 (The plaintiff: "I try and just go to Stop and Shop and grab everything at once, 15 minutes in and out.").

Third, the ALJ stated in conclusory fashion and without explanation, "Other examinations of the claimant, including [the] consultative examination, do not suggest the more significant limitations opined."  (Tr. 27 (citing Exhibit 8F, *i.e.,* Dr. Murphy's consultative examination)).  *See Loucks*, 2022 WL 2189293, at *3 (ruling that conclusory statements about a medical opinion's consistency with the record, without explanation, is procedural error); *Lisa T.*, 2022 WL 2207613, at *5 ("As district courts in this circuit have noted, at their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency of each of

the medical opinions, pointing to specific evidence in the record supporting those findings.")
(cleaned up, citing cases).  The Court acknowledges that the medical source statements from Drs.
Warren, Leib and Murphy indicate that the plaintiff's restrictions are less severe than Dr. Sandoli
described.  However, neither Dr. Warren nor Dr. Murphy had any relevant treatment notes from
Dr. Sandoli, and none of them had the benefit of her medical source statements.  (Tr. 84–91, 97,
494–498).  The ALJ is required to evaluate the consistency of the different medical opinions in
light of the objective evidence presented.  *See Pamela P.*, 2020 WL 2561106, at *5 ("Eschewing
rote analysis and conclusory explanations, the ALJ must discuss the crucial factors in any
determination . . . with sufficient specificity to enable the reviewing court to decide whether the
determination is supported by substantial evidence.") (internal quotation marks omitted).

     For these reasons, the Court concludes that the case should be remanded so the ALJ can
re-evaluate each of Dr. Sandoli's medical source statements and properly consider the
"supportability" and "consistency" of these statements in light of the objective medical evidence
and the other medical opinions.  Because there are no treatment notes in the record after January
3, 2022, on remand, the ALJ should request that Dr. Sandoli supplement her notes and provide an
up-to-date medical source statement.

### 3.    The ALJ May Choose to Reconsider His Evaluation of Consultative Examiner Kathleen Murphy on Remand.

     Because the Court remands this case based on the ALJ's error regarding Dr. Sandoli's
medical opinion, it will not evaluate the merits of the plaintiff's arguments as to the consultative
examiner, Dr. Murphy.  The Court notes that Dr. Murphy issued her medical source statement on
July 31, 2021, so she did not have the benefit of Dr. Sandoli's relevant treatment notes or medical
source statements.  (Tr. 494).  On remand, the ALJ should order that a new consultative
examination be conducted based on an up-to-date medical record.

### B.    Residual Functional Capacity Determination

An RFC is dependent in part on a proper evaluation of the medical opinions, so the Court does not address the RFC determination here.  On remand, the ALJ must re-evaluate the RFC based on a proper review of the medical opinion evidence.

### C.    Remand for Further Administrative Proceedings is Appropriate

While the plaintiff seeks an order reversing and remanding to the Commissioner for the payment of benefits, (*see* Doc. No. 17-1 at 21), the Court declines to do so.  "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'"  *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  The Court finds there to be insufficient persuasive proof that the plaintiff was disabled during the relevant period to remand for a calculation of benefits.  Simply put, there are outstanding issues that need to be resolved by the Commissioner.  As such, "[r]emand for calculation of benefits would . . . be inappropriate."  *Id*.  Because the identified issues need to be resolved by the Commissioner, the Court remands this matter for further administrative proceedings consistent with this ruling.

## VI.    CONCLUSION

For the foregoing reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **GRANTED IN PART** and **DENIED IN PART** to the extent the plaintiff seeks remand for the payment of benefits.  The Commissioner's motion for an order affirming that decision is **DENIED**.  On remand, the ALJ is instructed to: (1) order all treating providers, including Dr. Sandoli, to supplement the record; (2) re-evaluate the medical opinions consistent with this decision; (3) obtain a new consultative examination that is based on an up-to-date record and incorporates Dr. Sandoli's records after the onset date; and (4) determine the RFC and re-

31

evaluate Steps Four and Five in light of this Court's ruling, the revised RFC and the new evidence presented on remand.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. See 28 U.S.C. § 636(c)(3);  Fed. R. Civ. P. 73(c).

It is so ordered this 11th day of September, 2024, at New Haven, Connecticut.

 /s/ Robert M. Spector, U.S.M.J.
ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE